Michael Machat, Esq. SB#109475
MACHAT & ASSOCIATES, P.C.
8730 W. Sunset Blvd., Suite 250
West Hollywood, California 90069
Telephone: (310) 860-1833
Email: info@machatlaw.com

Attorneys for Plaintiff
Vampire Family Brands, LLC

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| VAMPIRE FAMILY BRANDS, LLC,<br><br>Plaintiff,<br><br>vs.<br><br>BUZZBALLZ, LLC,<br>SAZERAC COMPANY, INC,<br>and DOES 1 – 20,<br><br>Defendants. | CASE NO.<br><br>**COMPLAINT FOR TRADEMARK INFRINGEMENT and UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff VAMPIRE FAMILY BRANDS, LLC hereby alleges and asserts:

## I. JURISDICTION AND VENUE

1. Plaintiff brings this action for injunctive relief and damages arising out of the unauthorized, unfair, and deceptive competitive practices of Defendants, and each of them, in connection with the commercial use and exploitation of trademarks in violation of the Lanham Act.

2. This action arises under the Trademark Laws of the United States, including particularly, Section 43 of the Lanham Act, 15 U.S.C. §1125. Jurisdiction is conferred on this Court by 15 U.S.C. Section 1121(a), by 28 U.S.C. Section 1338(a), in that this case arises under the Trademark Laws of the United States, 15 U.S.C. Sections 1051, *et seq.* Venue is proper in this District under 28 U.S.C. §§ 1391(b) because a substantial part of the events or omissions giving rise to the claims asserted are occurring within this District.

## II. THE PARTIES

3. Plaintiff VAMPIRE FAMILY BRANDS, LLC ("VAMPIRE FAMILY BRANDS") is a Delaware Limited Liability Company with its main business office located in Los Angeles County, California.

4. Defendant BuzzBallz, LLC (BuzzBallz) is upon information and belief, a Texas Corporation. BuzzBallz markets, advertises and sells alcoholic products in the shape of balls, called BuzzBallz. BuzzBallz are offered in various flavors.

5. Defendant Sazerac Company, Inc. ("Sazerac") is upon information and belief, a Louisiana Corporation that sells its alcohol products nationwide, including in California and within this District. In 2024, it appears that Sazerac acquired BuzzBallz for a reported five hundred million dollars, according to press reports.

6. Apparently, to recoup the half a billion dollars it spent acquiring the brand, Sazerac introduced two-line extensions - VAMPIRE BLOOD and FRANKENTINI, just in time for the Halloween season.

7. Plaintiff owns a family of VAMPIRE and VAMPIRE related trademarks, and Defendants' VAMPIRE BLOOD ("the accused product") infringes Plaintiff's family of vampire brands' trademarks.

8. Plaintiff does not know the true names or capacities of defendants named herein as DOES 1 through 20 inclusive and therefore sues these defendants by such fictitious names. Plaintiff will seek leave to amend this First Amended Complaint to allege the true names, capacities, and circumstances alleging the liability of said defendants at such time as the same is ascertained. Plaintiff is informed and believes and, on that basis, alleges that each fictitiously named defendant is responsible in some manner for the occurrences herein alleged and that Plaintiff's damages as herein alleged were proximately caused by the conduct of such defendants.

9. At all times herein mentioned, Plaintiff is informed and believes and based thereon alleges each of the defendants sued herein, were the agents, servants, employees or attorneys of their co-defendants, and in doing the things hereinafter alleged were acting within the purpose, course and scope of such agency and employment, and with the authority, permission and consent of their co-defendants.

## III. FACTS GIVING RISE TO THIS ACTION

### A. Plaintiff's Vampire Family Trademarks

10. For over thirty years, Vampire Family Brands, via its predecessors in interest, has been marketing and selling alcoholic beverages under its Vampire Family of marks. The Vampire Family of marks include the following federal registrations, many of which are incontestable pursuant to Section 15 of the Lanham Act, 15 U.S.C. § 1065:[1]

| **Mark** | **Reg. No.** | **Goods/Services** |
|---|---|---|
| VAMPIRE | 2263907* | Wine |
| | 3290011 | Glass- and beverage-ware |

[1] Plaintiff's marks that have become incontestable are denoted by an asterisk (*) following their U.S. Registration Numbers.

| | | |
|---|---|---|
| | 3669827* | Coffee and chocolate |
| | 3978444* | Restaurant and bar services |
| | 4776927 | Olive oil and balsamic vinegar |
| | 5444375 | Pre-mixed alcoholic beverages, other than beer based; pre-mixed alcoholic cocktails |
| | 6329522 | Hamburger sandwiches |
| VAMPIRE TACO | 4939034* | Tacos |
| VAMPYRE | 3082097* | Distilled spirits |
| VAMPYRE | 7151997 | Tea |
| DRACULA | 3319536* | Wine |
| | 6562370 | Hamburger sandwiches |
| VAMPIRE SPIRITS | 8439225 | Pre-mixed alcoholic beverages, other than beer-based; Prepared alcoholic cocktail; Alcoholic cocktails; Distilled spirits |
| DRACULA'S DAUGHTER | 7853075 | Wine; Alcoholic beverages, except beer; Sparkling wine |
| FANGRIA | 4451648* | Sangria; wine |
| VAMPIRO | 7770178 | Wine |
| VAMP | 8147317 | Non-alcoholic drinks, namely energy shots |
| SIP THE BLOOD OF THE VINE | 3079403* | Wines and Distilled Spirits |

11. The origin of Vampire wine, and Vampire Family Brand's claim of right, goes back to 1988, when its founder released a French-bottled Algerian Syrah under the brand name Vampire. The first sale was to MCA Records and Alice Cooper, and the wine was promoted under the slogan, "Sip the Blood of the Vine." Vampire Family Brand's predecessors in interest began to use the slogan "Taste of Immortality" by at least 1995. Although the labels have changed over the years, along with the sourcing from Algeria to Italy and then to Transylvania and, finally, to Napa, the marketing has remained similarly playful.

12. However, as the source of the wine shifted from Transylvania, Romania to Napa, California, the marketing evolved to emphasize that the quality of the wine was extremely good, with Vampire wine having won many gold medals throughout the years and scores of 90 Points and higher ratings from various critics.

13. Plaintiff, via its predecessors in interest, later expanded its wine business into distilled spirits, energy drinks, soft drinks, coffee and other gourmet quality products.

14. Plaintiff's VAMPIRE SPIRITS ABSINTHE COCKTAILS were rated 95 Points, exceptional, and awarded a gold medal by the Beverage Tasting Institute.

15. Prior to the release of Plaintiff's VAMPIRE SPIRITS ABSINTHE COCKTAILS, Plaintiff via its predecessor in interest had been selling a ready to drink VAMPIRE BLOODY MARY, which due to canning issues is temporarily off the market. Plaintiff will be bringing it back in another format, other than in a can.

16. Plaintiff's VAMPIRE family of brands are available for the world to see on its website www.Vampire.com. The brands have been featured and covered in various national magazines and newspapers, including Maxim, InStyle, Elle,

Shape, Star Magazine, the New York Times, the LA Times, the Houston Chronicle, the Star Tribune, the Chicago Sun Times, and many more. In addition, Plaintiffs' VAMPIRE family of brands have been shown on various national television shows, such as The View with Oprah Winfrey, Anderson Cooper (with Ashley Greene from Twilight fame), CNN Headline News, MTV's Viva La Bam, Food TV, and many more. (*See* Exhibit D).

17. Plaintiff markets its brands through a national network of wholesalers and via www.Vampire.com direct to consumers. VAMPIRE wines are sold nationally for under $20 per bottle at retail stores. VAMPIRE wines also are available in bars and restaurants on wine lists. DRACULA wines are sold for under $30.00 per bottle. VAMPIRO sells for under $30 per bottle. VAMPYRE Vodka – (both the red colored version and the clear version) sells for anywhere between $20 and $30.00 per bottle. VAMPYRE Tequlia sells for anywhere between $40 and $100 per bottle. VAMPIRE coffee sells for under $20 per bag and VAMP energy shots sell for a few dollars each. The Vampire Spirits Absinthe Cocktails are sold for about $5 per 12oz can.

18. Plaintiff's branded products are sold nationally in retail chains stores, in bars and restaurants, online and elsewhere, including in defendant Sazerac's backyard in New Orleans where it's inconceivable Defendant Sazerac was not aware of Plaintiff's Vampire wine and spirits.

19. Plaintiff's family of Vampire products are sold nationally also direct to consumers from Plaintiff's website, www.vampire.com.

20. Plaintiff has spent hundreds of thousands of dollars advertising its Vampire Family of products on Facebook, Instagram and Google and has developed an enthusiastic cult following of fans who have given the brand hundreds if not thousands of great reviews.

21. Plaintiff and its associates continue to work hard to ensure that they put the best products in the bottle as possible. Over the last few years, Plaintiff's Vampire family of wines and spirits have received great reviews and won gold medals in many competitions, including the San Francisco Chronical Wine Competition for its Vampire Merlot, Vampire Cabernet Sauvignon, and Vampire Pinot Noir; the Los Angeles Invitational Wine challenge for its Vampire Cabernet Sauvignon and Vampire Pinot Noir; the Access Live Wine & Spirits Tasting Competition for its Vampire Merlot; and the Texas International Rodeo Wine Competition. Further, the Los Angeles International Wine & Spirits Competition gave Vampire Cabernet Sauvignon a rating of 92 points out of 100. Plaintiff's highest-end wine, Trueblood Cabernet Sauvignon, has been rated 92 points and 97 points out of 100 by critics. Plaintiff's Dracula's Daughter Prosecco Rose was awarded a platinum award and 98 points at the Las Vegas International Wine Competition.

22. Plaintiff continues to spend substantial amounts of time and money establishing, advertising, and promoting its Vampire family of brands. Plaintiff has established valuable goodwill through its brands' popularity, its advertising and sales, and its websites (including www.Vampire.com). This goodwill is embodied by Plaintiff's Vampire Family marks.

23. Plaintiff's expansion plans include a further foray into the ready-to-drink market, including a VAMPIRE margarita and a VAMPIRE vodka-based cocktail in addition to Plaintiff's ready-to-drink VAMPIRE absinthe cocktail and VAMPIRE bloody mary.

24. Besides the alcohol drinks, Plaintiff sells VAMPIRE coffee and offers its coffee for sale on its Vampire.com website and on Amazon.com, and it advertises its VAMPIRE COFFEE on Facebook and Instagram. Expansion plans

include the release of VAMPIRE Coffee cold brew in cans and other non-alcoholic beverages under the VAMPIRE brand.

25. Plaintiff's natural zone of expansion includes other beverages, including both alcoholic and non-alcoholic, in addition to foods and beverages, such as hot sauce, barbecue sauce, water, beers, and restaurants and bars. Plaintiffs have plans for each of these.

**B. Defendants' Unauthorized Use of Plaintiff's Vampire Family Marks**

26. Defendant Sazerac owns trademarks of their own, including the registered trademark BUFFALO TRACE which it heavily polices against anyone that uses a buffalo or bison on a beverage or food product. One would think Defendant Sazerac would know better than to use another's registered trademark to attract attention to its lineup of alcohol brands, namely its BuzzBallz cocktails which it recently acquired from Defendant BuzzBallz.

27. Defendants offer and sell its infringing goods throughout this District in numerous outlets displayed on their website https://www.buzzballz.com/store-locator/ where it invites a user to input their location and then select what appears to be a flavor.

28. However, when selecting among the various flavors, one sees two made-up flavors that are not flavors at all: Vampire's Blood and Frankentini.

29. Internet searches suggest that Defendants' Vampire's Blood and Frankentine are only available for a limited time – for Halloween.

30. Defendant Sazerac sells its infringing product to numerous DOE Distributors who then sell the infringing product to numerous DOE Retailers, some of them national chains, such as Total Wine & More all of which are making money off Plaintiff's registered trademarks and are being unjustly enriched in the process.

31. Exhibit A shows for example pictures of Defendants infringing BuzzBallz Biggies Vampire Blood sold for $16.99 at the Total Wine & More store in Beverly Hills and for $18.99 at the Midwest retailer HyVee.

32. In small print underneath Vampire Blood, the label says the product is made from vodka with natural flavors and certified colors. Plaintiff's VAMPYRE red vodka is also made with certified colors, and it has been sold in many of the same retail stores that Defendant's accused product is sold including, for example Total Wine & More.

33. Exhibit B shows a collage of Plaintiff's Vampire Family of branded products adjacent to Defendants' accused product.

34. Exhibit C shows Defendants' VAMPIRE BLOOD accused product being sold in a BevMo Store in Studio City, Los Angeles, where the use of the TM trademark symbol follows the words "VAMPIRE BLOOD." The accused product is sold for $21.99 before tax in this store.

35. Defendants' accused Vampire Blood product is a ready-to-drink cocktail.

36. Plaintiff also sells ready-to-drink cocktails, including its gold medal winning, 95-point rated Vampire Absinthe Cocktail.

37. Defendants' accused Vampire Blood product is made from vodka and is made with certified red coloring.

38. Plaintiff's VAMPYRE red vodka also is made with certified red coloring. Remarkably over twenty years ago, while Plaintiff's founder was pitching his VAMPYRE red vodka as "*blood like*" to a top executive from the nation's largest wine and spirits company, the executive suddenly became enraged, stood up from behind his desk, shouted, "You're spoofing the industry!" and showed Plaintiff's founder the door.

39. Times have changed, and those in the industry obviously now have changed their mind. But instead of buying Plaintiff's authentic VAMPYRE vodka with red coloring, or Plaintiff's other VAMPIRE products, Defendants decided to simply copy and hijack Plaintiff's branding.

40. Since that meeting with the nation's largest distributor, Plaintiff, via its predecessors in interest, expanded its Vampire Family of Brands to further include "*blood like*" products, such as an authentic Spanish sangria[2] called Fangria.

41. Of course, Plaintiff, via its predecessors in interest, has been selling the BLOOD OF THE VINE[3] going all the way back to 1988, a time when VAMPIRE WINE was thought by many in the industry and by some of the executives at Sazerac to be scandalous and almost sacrilegious.

42. Undoubtedly Defendants' top executives have been aware of Plaintiff's VAMPIRE wine for at least 30 years with the brand having been shown yearly at the Wine & Spirits Wholesale Association Convention, an industry convention closed to the public and attended by these top executives. Now suddenly, perhaps a different set of executives, under pressure to recoup the half a billion dollars its bosses spent acquiring the BUZZBALLZ brand, have decided it's ok to sell and market alcoholic products using "vampire" and "blood" regardless of Plaintiff's preexisting trademarks.

43. Besides Vampyre Vodka, Plaintiff also sells other distilled spirits, including Vampyre Tequila and Vampire Absinthe, each of which is commonly used by consumers with mixers to create a cocktail. Plaintiff plans on selling other

[2] The word sangria comes from the Spanish ***sangría***, which derives from the word ***sangre*** (meaning **"blood"**).

[3] SIP THE BLOOD OF THE VINE is one of Plaintiff's registered and incontestable trademarks.

Vampire branded ready-to-drink cocktails, including a Vampire Espresso Martini cocktail made with Plaintiff's Vampyre Vodka and Vampire Coffee.

44. Plaintiff advertises its wines and spirits and coffee and chocolate on Facebook, Instagram and Google, the same marketplace defendants are marketing and advertising its infringing product. Google searches for Plaintiff's VAMPIRE brand reveal Defendants' infringing product.

45. Plaintiff sells its VAMPIRE brands of products in the same retail stores as Defendants sell its accused product.

46. Defendants unlawfully promote, advertise, market and sell its infringing Vampire Blood from its websites, and from its partner Doe Defendants' websites, and from its partner Doe Defendants' retail brick and mortar stores, each of which are being unjustly enriched by selling the accused product using Plaintiff's trademarks.

47. Plaintiff promotes, advertises, markets and sells its authentic VAMPIRE products from its vampire.com website, as well on third-party retailer websites who sell authentic VAMPIRE products.

48. Plaintiff has spent substantial amounts of time and money building up, advertising, and promoting its VAMPIRE brands. By virtue of the popularity of its brands, its advertising, promotion, and sales, plus the popularity of its websites, including vampire.com, Plaintiff has built up and owns extremely valuable goodwill which is symbolized by Plaintiff's various marks.

49. Defendants' financial resources and ability to spend money advertising, marketing and selling their accused product dwarf's Plaintiff's resources. Defendants' intentional wrongful acts are harming Plaintiff's brands reputation and are diluting Plaintiff's brands and are disparaging.

50. If Defendants are not stopped from marketing its infringing Vampire Blood cocktail using Plaintiff's Vampire mark, then consumers will likely be

confused about the source and origin of defendants' products and mistakenly conclude that defendants' products are produced by, or associated with, Plaintiff and/or its licensees.

51. Alternatively, if defendants are not stopped from marketing beverages using Plaintiff's VAMPIRE mark, then consumers will likely be confused about the source and origin of Plaintiff's products and mistakenly conclude that Plaintiff's products are produced by, or associated with, defendants. Consumers may mistakenly come to believe Plaintiff is knocking off Defendants' brands instead of Defendants knocking off Plaintiff's trademarks.

**COUNT I**
**VIOLATION OF LANHAM ACT 15 U.S.C. §1125(a)**

52. Plaintiff realleges the allegations in paragraphs 1 though 51.

53. Defendants have abundantly large resources with which to market and advertise its goods and services. Defendants' resources vastly exceed those of Plaintiff. Consequently, Defendants' marketing and advertising efforts are likely to mislead consumers into believing that Plaintiff's goods and services may be unauthorized use of trademarks that Sazerac and BuzzBallz own and its Doe co-defendants sell and market. If defendants can continue their wrongful acts, consumers are likely to be misled to mistakenly believe that Plaintiff is misusing the VAMPIRE mark.

54. Defendants' use of the word vampire on its accused product, so closely resembles Plaintiff's products (including Plaintiff's Vampire RTD Cocktails and VAMPYRE vodka) that the public is likely to be confused and deceived, and to assume erroneously that defendants' goods are those of Plaintiff, or that defendants are in some way connected with, sponsored by, or affiliated with Plaintiff, all to Plaintiff's detriment and irreparable damage.

55. Defendants are not affiliated with, connected with, endorsed by, or sponsored by Plaintiff, nor has Plaintiff approved or authorized any of the goods or services offered or sold by defendants.

56. Plaintiff has no control over the nature and quality of the goods and services offered and sold by defendants or its licensees. Any failure, neglect, or default by defendants or its licensees in providing such products or services will reflect adversely on Plaintiff as being the believed source of said failure, neglect, or default, thereby hampering Plaintiff's efforts to continue to protect its outstanding reputation and preventing Plaintiff from further building its reputation. Said failure, neglect, or default will result in loss of revenue by Plaintiff, and loss of value of Plaintiff's considerable expenditures to promote its goods and services under the VAMPIRE mark, all to the irreparable harm of Plaintiff.

57. Defendants' sales, marketing and promotion of its infringing Vampire Blood on Meta platforms and other social media interferes with and hampers Plaintiff's ability to market and promote its products on Meta and elsewhere on social media.

58. Without the knowledge or consent of Plaintiff, Defendants have marketed and sold in interstate commerce, and in commerce substantially affecting interstate commerce, products and services branded using the name VAMPIRE and continue to do so. Defendants have promoted, publicized, advertised, offered for sale, and/or sold, products and services using the VAMPIRE mark through persons not authorized, employed by, or associated in any way with Plaintiff and have used the aforementioned trade name and trademark as a false designation and false representation for beverage products.

59. None of defendants' activities complained of in this complaint have been authorized by Plaintiff, and such unauthorized use by Defendants of Plaintiff's trademarks and/or trade names in interstate commerce, commerce

substantially affecting interstate commerce in this district, and elsewhere throughout the United States, constitutes infringement and an inducement to infringe Plaintiff's trademarks and/or trade names, and such activities are likely to cause confusion, mistakes, and to deceive the public at large.

60. Upon information and belief, Defendants have acted with the unlawful purpose of:

a. Improperly taking advantage of the valuable goodwill belonging to Plaintiff;

b. Soliciting Plaintiff's customers and/or potential customers, attempting to sell, and selling to such customers and potential customers, goods and services marketed under the VAMPIRE mark through persons and companies not authorized by, employed by, or associated in any way with Plaintiff;

c. Inducing others, including retailers, to infringe Plaintiff's trademarks and trade names; and

d. Causing the goods of persons or companies not authorized by, employed by, or associated in any way with Plaintiff to be falsely advertised and represented as if they were rendered, authorized, sponsored by, endorsed by, or otherwise connected with Plaintiff and its licensed trademarks and trade names.

61. Defendants' conduct constitutes a violation of 15 U.S.C. § 1125(a).

62. If Defendants are allowed to continue marketing and selling and advertising the accused product, Plaintiff will be damaged as alleged in this complaint, and the Defendants will profit thereby. Furthermore, unless the Court permanently enjoins Defendants conduct as alleged in this complaint, Plaintiff's business, goodwill, and reputation will suffer irreparable injury of an insidious and

continuing sort that cannot be adequately calculated and compensated in monetary damages.

63. Defendants have hijacked Plaintiff's Vampire trademark. Hijacking Plaintiff's Vampire trademark improves the relevance of ads on searches that included "Vampire" keywords and make defendants' cocktails more interesting to potential buyers, leading to greater sales than if they don't use Plaintiff's Vampire trademark. It leads to more people hearing about defendants' infringing accused product, leading them to come in and buy defendants' infringing accused product and then try other BuzzBallz products as well while the consumers were in the store or subsequently while shopping on defendants' websites. Hijacking Plaintiff's mark lowered defendants' costs of advertising while improving defendants' sales and profits.

64. Defendants have not used the word vampire to describe a flavor, since there is no such thing as a vampire flavor or a vampire's blood flavor, and instead have used the word Vampire as a trademark, and are even claiming trademark use by adding the TM symbol. (See Exhibit C - signage at the Studio City BevMo store.)

65. Defendants' use of VAMPIRE was designed to entice consumers unfamiliar with Defendants' BuzzBallz line of cocktails to sample the accused product and then bring new consumers into the BuzzBallz fold, after the infringement ends.

66. Defendants' aforementioned acts and conduct are being done willfully and with an intent to ride on, and/or step on and demolish, the goodwill Plaintiff has worked hard to develop. Plaintiff is therefore entitled to treble damages arising therefrom, disgorgement of defendants' profits, as well as reimbursement of Plaintiff's attorneys' fees and costs.

67. The intentional and willful nature of Defendants' acts makes this an exceptional case under 15 U.S.C. §1117(a).

68. The intentional nature of Defendants' acts and conduct make this a case suitable for an award of Three Times Defendants' profits plus attorneys' fees.

**COUNT II**
**VIOLATION OF LANHAM ACT 15 U.S.C. §1114**
**(Against All Defendants)**

69. Plaintiff repeats each allegation contained in paragraphs 1 through 68 as though set forth herein at length.

70. Despite having trademarks of their own, and despite knowing the importance of having registered trademarks of their own and taking steps to protect their own trademarks, Defendants nevertheless have intentionally decided to infringe Plaintiff's registered trademarks.

71. As alleged herein, Defendants have engaged in, and continue to engage in, the wrongful exploitation of Plaintiff's registered marks.

72. Defendants' goods are so closely related to Plaintiff's goods that the public is likely to be confused, to be deceived, and to erroneously assume that Defendants' marketing and sale of their VAMPIRE branded goods as packaged, advertised and promoted, are those of Plaintiff, or that Defendants are in some way connected with, sponsored by, or affiliated with Plaintiff, all to Plaintiff's detriment and irreparable damage.

73. Defendants are not affiliated with, connected with, endorsed by, or sponsored by Plaintiff. Furthermore, Plaintiff has not approved any of the goods or services offered or sold by Defendants.

74. Defendants aforesaid infringing conduct has been willful and its infringing product has been sold and offered for sale, marketed and advertised by Defendants with an intent to ride on, and/or step on and demolish, the goodwill

Plaintiff has worked hard to develop. Defendants' aforesaid infringing conduct has been willful and with knowledge that the sale, marketing, advertisement, and promotion of their Vampire branded infringing product will hinder the prospects of future commercial success of Plaintiff's VAMPIRE family of brands, including its future expansion of Plaintiff's Family of brands. Plaintiff is therefore entitled to treble damages arising therefrom, as well as reimbursement of Plaintiff's attorneys' fees and costs.

**WHEREFORE, Plaintiff prays for judgment as follows:**

1. That the Court adjudge and decree that Defendants have falsely designated the origin of certain goods and services as those of Plaintiff, have made and used false representations in connection with the sale, offering for sale, promotion and advertising of such goods and services, and have unfairly competed with Plaintiff at common law.

2. That the Court adjudge and decree that Defendants have infringed Plaintiff's registered trademarks willfully and intentionally.

3. That the Court adjudge and decree that Defendants unlawfully induced others to infringe upon Plaintiff's trademarks.

4. That the Court permanently enjoin Defendants, its agents, servants, employees, attorneys, and all persons acting in concert or participation with them, or with any of them from:

   a. Using VAMPIRE, or any other word or words which are similar to, or a colorable imitation of, Plaintiff's trade names and marks, either alone, as part of, or together with, any other word or words, (including Dracula), trademark, service mark, trade name, or other business or commercial designation in connection with the sale, offering for sale, advertising, and/or promotion of beverage products and beverage accessories;

b. Selling, offering to sell, marketing, distributing, advertising and/or promoting any beverage product, goods or service with the word VAMPIRE or DRACULA displayed on any product, packaging, advertising or promotional materials;

c. Representing directly or indirectly by words or conduct that any beverage product, goods or services offered for sale, sold, promoted, or advertised by Defendants, is authorized, sponsored by, endorsed by, or otherwise connected with Plaintiff;

d. Aiding or abetting in unfair competition against Plaintiff;

e. Aiding or abetting in false advertising; and

f. Inducing others to engage in any of these aforementioned acts.

5. That the Court award an amount to be determined at trial but at least an amount equivalent to treble the amount of the greater of Plaintiff's damages or Defendants' illicit profits that Defendants have been unjustly enriched (including profits made by the defendants from sales of other BuzzBallz products since they used Plaintiff's mark to entice consumers to sample their other BuzzBallz products.)

6. That the Court award an amount to be determined at trial but at least an amount equal to the cost of prospective corrective advertising to cover a national campaign that would generate at least ten times the number of impressions of defendant's unlawful promotional campaign which would cover the cost of the corrective advertising necessary to make up for the damage done by defendants' advertising and promotion to Plaintiff's brands.

7. That the Court award Judgment against Defendants for the full costs of this action, including the attorney's fees reasonably incurred by Plaintiff.

8. That the Court Order such other, further and different relief as the nature of this action may require and as the Court may deem just and proper.

9. That the Court retain jurisdiction of this action for the purpose of enabling Plaintiff, in its discretion, to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the interpretation or execution of any Order entered in this action, for the modification of any such Order, for the enforcement of compliance therewith, and/or for the punishment of any violation thereof.

**DEMAND FOR JURY TRIAL**

Plaintiff requests trial by jury on all triable issues raised by the Complaint.

Respectfully submitted,
MACHAT & ASSOCIATES, P.C.

Dated: September 25, 2026

By: */s/Michael Machat*
Michael Machat, Esq.
Attorneys for Plaintiff
Vampire Family Brands, LLC